United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

M.A.L.,

              Plaintiff,

    v.

MARTIN O'MALLEY,

              Defendant.

Case No.  23-cv-03565-VKD

**ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 10, 14

Plaintiff M.A.L.[1] appeals a final decision of the Commissioner of Social Security ("Commissioner")[2] denying her applications for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 423, 1381, *et seq*.  M.A.L. contends that the administrative law judge ("ALJ") failed to provide legally sufficient reasons for discounting her allegations of pain and physical dysfunction, and did not properly evaluate the opinion of consulting physician, Vasantha Natarajan, M.D.  M.A.L. also argues that the ALJ failed to develop the record and that remand is required for the ALJ to review additional evidence submitted to the Appeals Council after the ALJ issued her decision.

      The parties have filed cross-motions for summary judgment.  Dkt. Nos. 10, 14, 15.  The matter was submitted without oral argument.  Upon consideration of the moving and responding

---

[1] Because orders of the Court are more widely available than other filings, and this order contains potentially sensitive medical information, this order refers to the plaintiff only by her initials.  This order does not alter the degree of public access to other filings in this action provided by Rule 5.2(c) of the Federal Rules of Civil Procedure and Civil Local Rule 5-1(c)(5)(B)(i).

[2] Pursuant to Federal Rule of Civil Procedure 25(d), Martin O'Malley, Commissioner of Social Security, is substituted as defendant in place of Kilolo Kijakazi.

papers and the relevant evidence of record, for the reasons set forth below, the Court grants in part and denies in part M.A.L.'s motion for summary judgment, grants in part and denies in part the Commissioner's cross-motion for summary judgment, and remands this matter for further administrative proceedings consistent with this order.[3]

## I.    BACKGROUND

M.A.L. was 45 years old on the alleged disability onset date of June 3, 2019, when she was involved in a car accident.  She had a sixth grade education in Mexico.  She has worked as an agricultural packer, harvest worker, and hand packager.  *See* AR[4] 65, 70, 87, 350, 404, 446.

M.A.L. protectively filed an application for disability insurance benefits and an application for supplemental security income on August 26, 2020.  *See* AR 107, 108, 301-317, 335.  M.A.L. says that she is unable to work due to neck issues, disc injury, shoulder issues, and lower back issues.  *See* AR 349.  Her applications were denied initially and on reconsideration.  AR 87-150. An ALJ held a hearing on May 24, 2022.  AR 62-86.

On July 20, 2022, the ALJ issued an unfavorable decision.  AR 41-54.  She found that M.A.L. meets the insured status requirements of the Act through December 31, 2023, M.A.L.'s date last insured.  AR 44.  She found that M.A.L. has not engaged in substantial gainful activity since the June 3, 2019 alleged onset date.  *Id*.

The ALJ found that M.A.L. has the following severe impairments:  degenerative disc disease of the cervical and lumbar spine with radiculopathy, costochondritis, and myofascial pain syndrome of the thoracic spine.  *Id*.  The ALJ further found that M.A.L. does not have an impairment or combination of impairments that meets or medically equals the severity of one of the impairments listed in the Commissioner's regulations.  AR 46.  The ALJ determined that M.A.L. has the residual functional capacity ("RFC") to perform light work, with some limitations:

> After careful consideration of the entire record, the undersigned

---

[3] All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by a magistrate judge.  28 U.S.C. § 636(c); Fed. R. Civ. P. 73; Dkt. Nos. 6, 8.

[4] "AR" refers to the certified administrative record lodged with the Court.  Dkt. No. 9.

United States District Court
Northern District of California

> finds that the claimant has the residual functional capacity to
> perform "light" work as defined in 20 CFR 404.1567(b) and
> 416.967(b) except with the following limitations:  she could
> occasionally perform overhead reaching.  The claimant should not
> climb ladders, ropes, and scaffolds.  She could occasionally climb
> ramps and stairs.  The claimant could occasionally stoop, kneel,
> crouch, and crawl.  She should not work at unprotected heights.

AR 47.  The ALJ found that M.A.L. is unable to perform any past relevant work, and that transferability of job skills is not material to the determination of disability.  AR 52.  Based on M.A.L.'s age, education, work experience, and RFC, the ALJ determined that she can perform other jobs that exist in significant numbers in the national economy—namely, bagger, basket filler, and stuffer.  AR 52-54.  Accordingly, the ALJ concluded that M.A.L. has not been disabled, as defined by the Act, from June 3, 2019 through the July 20, 2022 date of the ALJ's decision.  AR 54.

The Appeals Council denied M.A.L.'s request for review of the ALJ's decision.  AR 1-8.  M.A.L. then filed the present action seeking judicial review of the decision denying her applications for benefits.

## II.    LEGAL STANDARD

Pursuant to 42 U.S.C. § 405(g), this Court has the authority to review the Commissioner's decision to deny benefits.  The Commissioner's decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards.  *Ahearn v. Saul*, 988 F.3d 1111, 1115 (9th Cir. 2021) (citation omitted); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999) (citation omitted).  In this context, the term "substantial evidence" means "more than a mere scintilla" but "less than a preponderance" and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Ahearn*, 988 F.3d at 1115 (quoting *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) and *Molina v. Astrue*, 674 F.3d 1104, 1110-11 (9th Cir. 2012), *superseded by regulation on other grounds*); *see also Morgan*, 169 F.3d at 599 (citation omitted).  When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence.  *Ahearn*, 988 F.3d at 1115 (citation omitted); *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989).

United States District Court
Northern District of California

Where evidence exists to support more than one rational interpretation, the Court must defer to the decision of the Commissioner. *Ahearn*, 988 F.3d at 1115-16 (citation omitted); *Morgan*, 169 F.3d at 599 (citation omitted).

## III.    DISCUSSION

### A.    M.A.L.'s Allegations of Pain and Physical Dysfunction

M.A.L. argues that the ALJ failed to provide clear and convincing reasons, supported by substantial evidence, for discounting her allegations of pain and physical dysfunction. The Commissioner maintains that the ALJ reasonably discounted M.A.L.'s subjective symptom allegations.

#### 1.    Summary

In an October 12, 2020 exertion questionnaire, M.A.L. stated that after walking 10 to 15 minutes, she "feel[s] lots of pain in [her] waist and [her] chest." AR 374. She indicated that she climbs stairs, can lift "very light things," and can carry "no more than 2 pounds." AR 375. M.A.L. said that she goes grocery shopping every week with her family. She drives herself places only if her husband or family are not available to drive. *Id*. M.A.L. stated that pain stops her from completing housework and other chores. AR 376. M.A.L. further reported that she sleeps seven hours per night; does not nap during the day; does not use assistive devices; and takes gabapentin, cyclobenzaprine, naprosen, and hydrocodone-acetaminophen. AR 376.

At the May 24, 2022 administrative hearing, M.A.L. testified that she is unable to work due to pain, and that her arms feel "weak" with "pain and numbness." AR 71. She stated that she does "a little" cooking at home, and does dishes "very little," noting that she has had issues dropping dishes and that her husband and daughters help her. AR 71-72. M.A.L. stated that she cannot lift a gallon of water, and that she has "a lot of pain in [her] lower back and [her] leg" when tying her shoelaces. *Id*. She testified that she can sit for 15 minutes, or up to 30 minutes, and that some days are better than others, but she has to get up to "give [her] leg a rest." AR 72. She further stated that she can walk for 15 or 20 minutes; has problems lifting, reaching overhead, and pulling; and experiences pain, numbness, and tingling in her arms when they are resting at her side with her elbows bent. AR 73-74. M.A.L. testified that she takes medications, including

gabapentin, for pain, and that the dosage was lowered due to gastrointestinal issues.  AR 74.

M.A.L. noted that she was experiencing increased pain, had been having headaches, and had a

medical appointment scheduled for several days after the hearing for neck pain radiating toward

the left side of her head.  AR 75-76.

Treatment records indicate that on June 3, 2019, the day of her car accident, M.A.L.

presented to a clinic with complaints of back and neck pain, primarily on the left side, with neck

pain radiating slightly down her left leg, but without numbness, tingling, or muscle weakness.  AR

482.  A subsequent physical examination revealed intact sensation, full muscular strength, and full

active and passive range of motion. AR 481.  M.A.L. was assessed with low back pain, dorsalgia

(unspecified), and cervicalgia.  She was referred to physical therapy, and instructed to apply heat

to affected areas, rest, stretch, and take Aleve.  AR 481-482.  June 2019 x-rays revealed that

M.A.L.'s cervical spine was "[n]ormal for age," showed no issues with her thoracic spine, and

showed an essentially normal lumbar spine, except for "[p]ossible extremely subtle" spondylosis.

AR 614-616; *see also* AR 536.  A subsequent August 2019 x-ray of the thoracic spine revealed

"[n]o fracture, arthropathy, acute osseous or soft tissue abnormality[.]"  AR 493.

Beginning in December 2019, M.A.L. began seeing Lisa Kroopf, M.D. for pain

management treatment.  M.A.L.'s course of treatment with Dr. Kroopf consisted of a variety of

measures, including the application of heat and ice, over-the-counter analgesic medications, a

home exercise program, prescription medications (including gabapentin and cyclobenzaprine), a

TENS unit, and physical therapy.  *See, e.g.,* AR 534, 544, 550, 814, 993.  Additionally, the record

indicates that from around the spring of 2020 through February 2021, M.A.L. received several

epidural steroid injections, trigger point injections, and a Toradol injection.  *See* AR 567, 687, 733,

737, 795, 808, 818-819, 895, 992, 1003.

During her first visit with Dr. Kroopf on December 11, 2019, M.A.L. reported low back

pain, radiating to the left leg, as well as pain in the upper back, neck, and shoulders.  AR 534.

M.A.L. stated that her pain level that day was 7/10, with pain levels generally ranging from 3/10

(at best) and 10/10 (at worst).  *Id*.  M.A.L. also reported associated symptoms of weakness, and

said that her pain interferes with sleep, lifting heavy or light objects, and activities such as

United States District Court
Northern District of California

housecleaning, cooking, and laundry.  *Id.*  Dr. Kroopf initially assessed low back pain, other intervertebral disc degeneration in the lumbar region, and sprain of other parts of the lumbar spine and pelvis.  AR 536.  At that time, Dr. Kroopf "anticipate[d] that [M.A.L.] [would] have full resolution of these symptoms with appropriate conservative management in a timely fashion," stating that M.A.L. could return in three months if she was not better.  *Id.*

While the record documents M.A.L.'s reported significant relief of some symptoms, she continued to report ongoing pain and a worsening of some symptoms over time.  For example, in a March 11, 2020 visit with Dr. Kroopf to follow-up on low back pain, M.A.L. also reported pain in the posterior neck radiating to her right shoulder and arm.  M.A.L. noted that her symptoms are alleviated with Toradol injections and massage, and that her neck and shoulder pain had improved with physical therapy, but the pain had returned and was worse when lifting objects.  AR 548.  In addition to low back pain, and lumbar sprain and intervertebral disc degeneration, Dr. Kroopf assessed cervicalgia.  AR 550.  While a March 19, 2020 MRI of the cervical spine showed "[m]ild findings of spondylosis" and "[n]o evidence of neural compression" (AR 562), in April 2020, M.A.L. reported that despite physical therapy, she had continued neck pain radiating to her left and right shoulders, with her current pain level at 8/10.  AR 541-542.  Dr. Kroopf recommended hot and cold therapy aids and prescribed a TENS unit for pain relief.  AR 541-544.  Additionally, Dr. Kroopf discussed a cervical epidural steroid injection, which M.A.L. received on May 7, 2020.  *See* AR 544, 560.

M.A.L. subsequently reported "greater than 50% relief of the primary pain," and that her "neck pain is significantly better," with overall improvement in her neck, right arm, and general movement.  However, she also reported "pain in the upper traps, mid traps bilaterally, right shoulder," radiating "to [the] upper chest muscles above the breasts."  AR 567.  Dr. Kroopf ordered an MRI of the thoracic spine and recommended that M.A.L. continue her home exercise program and activity as tolerated.  AR 568.

A June 2020 MRI of the thoracic spine was "[n]ormal for age," although M.A.L. stated that after some initial improvement following her June 2019 car accident, her symptoms had begun to worsen over the past few months, noting increased pain in her right shoulder, radiating

United States District Court
Northern District of California

6

down her right arm, with tingling sensation, for the past four days.  AR 685-686.  Dr. Kroopf noted tenderness along the upper trapezius, supraspinatus muscle, levator scapula, and pectoralis muscle, as well as giveaway weakness in right shoulder abduction.  *Id.*  She assessed myalgia of the neck muscle, myofascial muscle pain, and cervical intervertebral disc degeneration, and stated that M.A.L.'s "primary problem appears to be cervical thoracic sprain strain with ongoing overuse syndrome."  AR 686-687.  M.A.L. was given trigger point injections in the most tender areas, with instructions to continue exercises and to return in about a month to follow-up and for a possible repeat injection.  *Id.*

During a July 28, 2020 follow-up appointment, M.A.L. reported that the trigger point injections from her last visit helped her neck pain, but she also noted a return of tingling in her arm to the fingers, as well as occasional numbness and cramping in her left thumb.  She also reported having more lower back pain and difficulty walking due to pain.  AR 735.  Dr. Kroopf diagnosed acute left-sided low back pain without sciatica and radiculitis of the left cervical region.  She noted that M.A.L. "has multifocal aches and pains which appear primarily to be related to sprain strain injury and overuse syndrome."  AR 737.  Dr. Kroopf gave M.A.L. a Toradol injection for low back pain, as well as a trial of low-dose gabapentin, and recommended continued exercises for core stabilization, proper lifting techniques, and over-the-counter analgesic medications as needed.  AR 737-738.

In early October 2020, M.A.L. visited the emergency department, complaining of acute chronic back pain, radiating to her left abdomen, up her neck, and to her flanks.  She was assessed with exacerbation of chronic back pain and was given Naproxen and Norco.  AR 706-711, 817.  During an October 16, 2020 appointment with Dr. Kroopf, M.A.L. reported moderate to severe left-side neck pain, and stated that pain made it difficult for her to dress herself and comb her hair.  AR 817.  On physical examination, Dr. Kroopf noted tenderness to palpation diffusely in the left cervical, thoracic, and lumber areas.  AR 818.  M.A.L. was given a trigger point injection, and instructed to continue with analgesic medications, her home exercise program, and injections on an as-needed basis.  AR 819.  Later that month, Dr. Kroopf refilled M.A.L.'s prescription for cyclobenzaprine and gave her a new prescription for gabapentin.  AR 816.

United States District Court
Northern District of California

During a November 23, 2020 video appointment, M.A.L. noted that her last cervical epidural steroid injection received earlier in the year provided "significant pain relief lasting until about a month ago" and reported that the "pain has become very debilitating and is now interfering with her activities of daily living including her housekeeping and self-care." AR 808. Noting that M.A.L. "had a suboptimal response to conservative management to date, including prescription analgesics, OTC analgesics, [p]hysical therapy, [and] avoidance of exacerbating activity," Dr. Kroopf stated that "[b]ased on the history, physical examination, and diagnostic studies, [she] believe[d] that [M.A.L.]'s symptoms of intractable pain are due to cervical DDD" and that it was "reasonably and medically necessary to perform a cervical epidural steroid injection or series of injections to decrease pain by decreasing inflammation and swelling of the nerve roots." AR 809-810.

During a February 3, 2021 follow-up video visit, M.A.L. reported that her pain remained the same and requested a repeat cervical epidural steroid injection, which she received on February 18, 2021. AR 806-807, 1003. A February 2021 MRI of the lumbar spine revealed "[d]egenerative changes with neural foraminal and lateral recess encroachment resulting nerve root abutment . . . most severely involving L4-L5 and L5-S1." AR 825-826.

During a follow-up visit on March 3, 2021, M.A.L. reported "significant improvement in the pain in the back of her neck and the left shoulder," but waxing and waning leg pain, and "very severe worsen[ing] pain in her lower back and legs for at least 3 days, which appeared to flare up after the neck injection." AR 992. She also complained of "pain shooting from her left lower back into her left leg along the medial and lateral aspect of the ankle," with worse pain when standing and walking, as well as pain radiating across her ribs. AR 993. Dr. Kroopf noted that M.A.L. has disc herniations at L4, L5, and S1, as well as "mild stenosis at L5[.]" Id. She refilled M.A.L.'s prescriptions for cyclobenzaprine for muscle spasms, gabapentin for neuropathic pain, and added Voltaren gel for costochondritis related to the rib pain. Id. The record indicates that Dr. Kroopf scheduled a lumbar epidural steroid injection for late March 2021. AR 993, 997-998.

As noted above, the ALJ found that M.A.L. has an RFC for light work, with certain postural and other limitations. AR 47. The ALJ discounted M.A.L.'s allegations of pain and

physical dysfunction, finding that while her medically determinable impairments could reasonably be expected to cause the symptoms she describes, M.A.L.'s "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" AR 52.  Here, the ALJ's decision rested primarily on what she found to be inconsistencies with the objective medical evidence, as well as a gap in treatment between March 2021 and January or February of 2022.[5]  The ALJ acknowledged that M.A.L. "did have some evidence of clinical findings consistent with her back, neck, and shoulder symptoms, with imaging consistent with lumbar and cervical degenerative disc disease." AR 49.  However, the ALJ concluded that "no more limiting RFC finding is supported by the overall medical evidence as a whole for any continuous 12-month period." AR 52.  Additionally, the ALJ explained that "[w]hile the claimant did have some injections and epidural steroidal injections, her treatment has been otherwise conservative with no evidence of treatment since early 2021." AR 49.

### 2.    Legal Standard

An ALJ is not "required to believe every allegation" of impairment.  *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1106 (9th Cir. 2014).  In assessing a claimant's subjective testimony, an ALJ conducts a two-step analysis.  First, "the claimant must produce objective medical evidence of an underlying impairment or impairments that could reasonably be expected to produce some degree of symptom." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (cleaned up).  If the claimant does so, and there is no affirmative evidence of malingering, then the ALJ can reject the claimant's testimony as to the severity of the symptoms "only by offering specific, clear and convincing reasons for doing so."  *Id.*  That is, the ALJ must make an assessment "with findings sufficiently specific to permit the court to conclude that the ALJ did not

---

[5] The parties do not address the ALJ's reasoning to the extent that the ALJ also appeared to base her assessment of M.A.L.'s allegations on M.A.L.'s activities of driving herself if her family is not available and cooking "a little." AR 51.  In any event, such activities are not substantial evidence supporting the ALJ's assessment, as there are no clear details in the record as to what M.A.L's performance of such activities entailed.  *See Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) ("Only if the level of activity were inconsistent with Claimant's claimed limitations would these activities have any bearing on Claimant's credibility.").

United States District Court
Northern District of California

United States District Court
Northern District of California

arbitrarily discredit claimant's testimony." *Id.* At the second step, "a claimant is *not* required to show that [her] medically determinable impairment could reasonably be expected to cause the severity of the symptom [she has] alleged, and is *not* required to produce objective medical evidence of the pain or fatigue itself, or the severity thereof." *Ferguson v. O'Malley*, 95 F.4th 1194, 1202 (9th Cir. 2024) (cleaned up, emphasis in original); *see also Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014). A reviewing court is "constrained to review the reasons the ALJ asserts." *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (quoting *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003)). "If the ALJ's finding is supported by substantial evidence, the court 'may not engage in second-guessing.'" *Tommasetti*, 533 F.3d at 1039 (quoting *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002)).

An ALJ may consider several factors, including (1) ordinary techniques of credibility evaluation; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. *Tommasetti*, 533 F.3d at 1039. Additionally, an ALJ may also consider the observations of treating and examining physicians and other third parties concerning the nature, onset, duration, and frequency of the claimant's symptoms; precipitating and aggravating factors; and functional restrictions caused by the symptoms. *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996). "Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis." *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005); *see also Smartt v. Kijakazi*, 53 F.4th 489, 498 (9th Cir. 2022) ("When objective medical evidence in the record is inconsistent with the claimant's subjective testimony, the ALJ may indeed weigh it as undercutting such testimony."). However, "an ALJ cannot insist on clear medical evidence to support each part of a claimant's subjective pain testimony when there is no objective testimony evincing otherwise." *Smartt*, 53 F.4th at 498.

### 3.    Analysis

#### a.    Objective evidence

In finding that M.A.L's allegations are not consistent with the objective medical evidence as a whole, the ALJ explained that "the combined findings, including the imaging and [physical

examination] findings are consistent with" her determination of M.A.L.'s RFC, "but the lack of gait, strength, sensory, or reflex findings are not consistent with further limitations." AR 49. The ALJ noted that "the radiographs in the record have shown only minimal abnormalities" and that physical examinations show "that [M.A.L.] has maintained normal gait with full strength and only giveaway weakness in the right shoulder." AR 51. Additionally, the ALJ explained that while early treatment records noted that M.A.L. was in "mild distress," M.A.L. "also appeared to report improvement after this time and was not noted as being in distress again with any consistency until the consultative examination."[6] AR 49. Further, the ALJ stated that the record did not reflect that M.A.L. reported having gastrointestinal side effects from her medications. *Id.*

M.A.L. does not challenge the ALJ's statement regarding a lack of reports about gastrointestinal side effects from medications, which statement appears to be an accurate characterization of the record. While the ALJ's observation that scant records note M.A.L. to be in "distress" is also accurate, so far as it goes (*see* AR 610, 978), that observation is not particularly significant with respect to M.A.L.'s apparent chronic neck and back pain. *See* SSR 16-3P (2017), 2017 WL 5180304 at *9 ("Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent."). The ALJ also correctly noted that M.A.L. reported improvement in some symptoms, but did not discuss M.A.L.'s reports in those same records of ongoing back pain and worsening of other symptoms. *See, e.g.,* AR 541-542, 548, 567, 685-686, 706-711, 735, 806-810, 816-818, 825-826, 992, 993. The ALJ stated that M.A.L.'s allegations of manipulative limitations are not consistent with objective evidence regarding "atrophy, strength, sensory, or other findings" (AR 49), but did not clearly explain why this is the case, or why "no significant abnormal findings of gait, but normal strength, sensation, and reflexes" are inconsistent with M.A.L.'s pain and physical dysfunction allegations. *See* *Ferguson*, 95 F.4th at 1200 ("[T]o satisfy the substantial evidence standard, the ALJ must provide

---

[6] The parties' arguments regarding M.A.L.'s April 2021 consultative examination and the ALJ's evaluation of consulting physician Dr. Natarajan's opinion are addressed below.

1   specific, clear, and convincing reasons which explain why the medical evidence is *inconsistent*

2   with the claimant's subjective symptom testimony.").

3        The ALJ did not provide sufficiently clear or specific reasons, supported by substantial

4   evidence, for discounting M.A.L.'s allegations based on the objective medical evidence.

5                            **b.      Course of treatment**

6        The ALJ acknowledged that M.A.L. had "some injections and epidural steroidal

7   injections," but discounted M.A.L.'s allegations because "her treatment has been *otherwise*

8   conservative with no evidence of treatment since early 2021." AR 49 (emphasis added).  The ALJ

9   noted, for example, that M.A.L. "generally takes only modest medications and denies the need for

10  naps during the day." AR 52 (citing AR 376).  While "evidence of 'conservative treatment' is

11  sufficient to discount a claimant's testimony regarding severity of an impairment," *Parra v.*

12  *Astrue*, 481 F.3d 742, 750-51 (9th Cir. 2007) (citing *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th

13  Cir. 1995)), the Commissioner does not dispute that injections may be indicative of a non-

14  conservative course of treatment.  *See generally Garrison*, 759 F.3d at 1015 n.20 (expressing

15  "doubt that epidural steroid shots to the neck and lower back qualify as 'conservative' medical

16  treatment.").  Instead, he argues that the salient point is that substantial evidence demonstrates that

17  M.A.L.'s treatment "significantly improved" her symptoms and her providers did not recommend

18  "more aggressive measures." Dkt. No. 14 at 5.  As discussed above, however, M.A.L.'s treatment

19  records as a whole indicate that she reported significant relief of some symptoms, but continued to

20  report ongoing pain and a worsening of some symptoms over time.  *See, e.g.,* AR 541-542, 548,

21  567, 685-686, 706-711, 735, 806-810, 816-818, 825-826, 992, 993.  In any event, by singling out

22  and focusing on M.A.L.'s "otherwise conservative" treatment, the ALJ did not properly assess

23  M.A.L.'s course of treatment as a whole.

24        An unexplained or inadequately explained failure to seek treatment may be considered

25  when evaluating a claimant's allegations of subjective symptoms.  *Tommasetti*, 533 F.3d at 1039.

26  At the May 24, 2022 hearing, the ALJ asked M.A.L. why there were no records evidencing any

27  treatment since March 2021.  AR 74.  M.A.L. responded that she had an appointment scheduled

28  for several days after the hearing, and also noted that she had had several injections around

United States District Court
Northern District of California

January or February 2022.  *Id.*  In her decision, the ALJ stated that even if M.A.L. had more recent treatment appointments, M.A.L. "still appeared to have a very large gap in treatment altogether, inconsistent with her alleged pain."  AR 49, 74, 75.  M.A.L.'s argument that the gap in treatment records triggered the ALJ's duty to develop the record is not persuasive.  An ALJ's duty to develop the record "is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence."  *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001); *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001).  In the present case, there was no ambiguity to resolve.  The ALJ inquired about the lack of treatment for months, and M.A.L.'s response of more recent and upcoming treatment in 2022 did not explain the apparent failure to seek treatment between March 2021 and early 2022.[7]  While M.A.L. did not fail entirely to seek treatment, *cf. Molina v. Astrue*, 674 F.3d 1104, 1114 (9th Cir. 2012) (despite physician's repeated recommendations, claimant failed to seek treatment for alleged mental impairment until after applying for benefits), *superseded by regulation on other grounds*, the ALJ did not err in considering M.A.L.'s gap in treatment in evaluating the credibility of her symptom allegations.

*** 

Viewing the record as a whole, while the ALJ properly considered the unexplained gap in M.A.L.'s treatment in discounting her symptom allegations, the ALJ erred in not providing sufficiently clear or specific reasons, supported by substantial evidence, for discounting her allegations based on the objective medical evidence, and the ALJ erred in characterizing a portion of M.A.L.'s course of treatment.  Because the ALJ found that M.A.L.'s medically determinable impairments could reasonably be expected to cause the symptoms she described, and because the RFC did not incorporate all limitations associated with the symptoms M.A.L. alleged, it is not clear from the record that the ALJ's errors were inconsequential to the assessment of M.A.L.'s RFC and the ultimate determination that M.A.L. is not disabled.  *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162–63 (9th Cir. 2008).  Thus, the Court cannot conclude that these

---

[7] As noted by the Commissioner, although M.A.L. submitted additional evidence after the ALJ issued her decision, the only record pre-dating the ALJ's decision was a colonoscopy report.

errors were harmless.  On this issue M.A.L.'s summary judgment motion is granted, and the Commisioner's summary judgment motion is denied.

### B.    Dr. Natarajan's Opinion

M.A.L. contends that the ALJ did not properly evaluate the medical source statement of Vasantha Natarajan, M.D., a consultant who conducted an internal medicine evaluation on April 23, 2021.  AR 977-982.  The Commissioner maintains that the ALJ gave valid reasons, supported by substantial evidence, in finding Dr. Natarajan's opinion unpersuasive.

### 1.    Summary

Dr. Natarajan, who did not review M.A.L.'s records, noted M.A.L.'s complaints of chronic pain in the neck, both shoulders, ribs, and upper back, mid-back, and lower back, with lower back pain radiating down her legs, as well as her report of off-and-on headaches.  AR 977.  With respect to activities of daily living, M.A.L. reported that she was able to do most of her daily activities, including bathe, dress, and feed herself; that she sometimes cooks and does dishes weekly; and that she is able to do laundry two times per week.  M.A.L. stated that she needs assistance from her husband and daughters, and that they help her with activities like shopping and driving.  *Id*.  Dr. Natarajan noted that M.A.L. was taking cyclobenzaprine, hydrocodone and acetaminophen, and diclofenac sodium 1% gel.  AR 978.

Dr. Natarajan observed that M.A.L. came to the examination with her daughter, who drove M.A.L. to the clinic.  Additionally, Dr. Natarajan noted that M.A.L. had a normal gait, but walked slowly, and that she "appeared to be in some kind of distress due to the pain."  AR 978.  M.A.L. required assistance from her daughter to remove her jacket.  While M.A.L. was able to get on and off the exam table, and sit on the exam table, Dr. Natarajan noted that she did so "with some difficulty due to the pain."  *Id*.  M.A.L. was also able to remove her shoes "with pain."  *Id*.

Dr. Natarajan reported that M.A.L. "was able to walk on toes only for a few steps," "was unable to walk on heels," and "was able to squat only halfway through."  AR 979.  A Romberg test was negative, and a finger-to-nose test was normal.  *Id*.  Dr. Natarajan documented M.A.L.'s cervical range of motion as:  "Flexion 0-30 degrees and extension 0-20 degrees.  Lateral flexion 0-20 degrees and rotation 0-80 degrees bilaterally."  *Id*.  M.A.L.'s lumbar extension was "Flexion 0-

United States District Court
Northern District of California

40 degrees and extension 0-10 degrees.  Lateral flexion 0-10 degrees bilaterally."  AR 980.  Dr. Natarajan further reported that M.A.L. was unable to perform range-of-motion for the hip "due to instability," noting that M.A.L. "was very unstable and she had to hold onto the exam table."  *Id*. M.A.L. stated that the exam exacerbated her pain, and Dr. Natarajan observed that M.A.L. was "now limping" and "unable to bear weight on the left leg."  *Id*.  M.A.L.'s range of motion in the shoulders was recorded as "Forward flexion 0-120 degrees, extension 0-30 degrees, abduction 0-100 degrees, adduction 0-20 degrees, internal rotation 0-80 degrees, and external rotation 0-80 degrees bilaterally."  *Id*.  Additionally, a straight-leg raising test on the right side was positive, "with shooting pain down the legs along with numbness at 40 degrees."  *Id*.  Dr. Natarajan reported that M.A.L. was unable to perform the straight-leg raising test in the supine position because she "had severe exacerbation of the pain when the limb was lifted to 20 degrees."  *Id*.  Dr. Natarajan noted normal motor strength, muscle bulk and tone, sensation, and reflexes.  AR 981.

On the whole, Dr. Natarajan stated that M.A.L. had "poor effort mainly due to the pain" and that "[f]or the entire exam during the encounter she was mostly holding onto the exam table." AR 980.  Additionally, the range-of-motion and straight-leg raising tests were found to be "very limited because [M.A.L.] was not able to bear weight and she was not able to balance" due to "fear of falling off."  *Id*.

Dr. Natarajan diagnosed (1) "[b]ilateral shoulder pain with limited range-of-motion on both the shoulders"; (2) "[n]eck pain with symptoms of tingling and numbness, neuropathy, but there is no objective evidence on exam.  [M.A.L.] has no evidence of radiculopathy"; and (3) "[l]ow back pain with symptoms of paresthesias, but there is no objective evidence of radiculopathy."  AR 981.  Dr. Natarajan opined that M.A.L. could stand "less than two hours in an eight-hour day"; walk "two hours in an eight-hour day"; sit "[t]wo to three hours, up to two hours in an eight-hour workday"; lift and carry "[l]ess than 10 pounds both occasionally and frequently"; is limited to "climbing up and down the stairs frequently"; has problems with "balance, stooping, crouching, kneeling and crawling"; is limited to occasionally reaching overhead, reaching forward, handling, fingering, and feeling; and does not need an ambulatory device.  AR 981-982.

United States District Court
Northern District of California

15

1

2           **2.     Legal Standard**

Under the regulations that apply to M.A.L.'s application, the Commissioner no longer

3   gives specific evidentiary weight to medical opinions, including the deference formerly given to

4   the opinions of treating physicians.  Instead, the Commissioner evaluates the "persuasiveness" of

5   all medical opinions in the record based on: (1) supportability; (2) consistency; (3) relationship

6   with the claimant; (4) specialization; and (5) other factors, such as "evidence showing a medical

7   source has familiarity with the other evidence in the claim or an understanding of our disability

8   program's policies and evidentiary requirements."  20 C.F.R. § 404.1520c;[8] *see also Woods v.*

9   *Kijakazi*, 32 F.4th 785, 787 (9th Cir. 2022) ("For claims subject to the new regulations, the former

10  hierarchy of medical opinions—in which we assign presumptive weight based on the extent of the

11  doctor's relationship with the claimant—no longer applies.").  "Now, an ALJ's decision, including

12  the decision to discredit any medical opinion, must simply be supported by substantial evidence."

13  *Woods*, 32 F.4th at 787.

14          Supportability and consistency are considered the most important factors, and the ALJ is

15  required to explicitly address them in his or her decision.  20 C.F.R. § 404.1520c(b)(2).

16  "Supportability means the extent to which a medical source supports the medical opinion by

17  explaining the 'relevant . . . objective medical evidence.'"  *Woods*, 32 F.4th at 791-92 (quoting 20

18  C.F.R. § 404.1520c(c)(1)).  "The more relevant the objective medical evidence and supporting

19  explanations presented by a medical source are to support his or her medical opinion(s) or prior

20  administrative medical finding(s), the more persuasive the medical opinions or prior

21  administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).  "Consistency means the

22  extent to which a medical opinion is 'consistent . . . with the evidence from other medical sources

23  and nonmedical sources in the claim.'"  *Woods*, 32 F.4th  at 792 (quoting 20 C.F.R.

24  § 404.1520c(c)(2)).  "The more consistent a medical opinion(s) or prior administrative medical

25  finding(s) is with the evidence from other medical sources and nonmedical sources in the claim,

26  _____

27  [8] Because the regulations regarding disability insurance benefits applications and supplemental
    security income applications are nearly identical, for simplicity this order cites only to the
28  regulations pertaining to disability insurance benefits applications.

United States District Court
Northern District of California

the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(2).  The ALJ "may, but [is] not required to," explain how he or she considered the remaining three factors listed in the regulations.  *Id.* § 404.1520c(b)(2).

### 3. Analysis

The ALJ found that '[t]he eroded 'sedentary' RFC assessments by [Dr. Natarajan,] the one-time examining consultative internist who noted the claimant's poor effort" were "not persuasive."  AR 50.  With respect to supportability, the ALJ acknowledged that "there are indications that the effort may be due to pain," but partially discounted Dr. Natarajan's opinion on the ground that the "opinion is explicitly based on subjective reports of limitations."  *Id.*  Indeed, in stating the basis for her functional assessment, Dr. Natarajan did not provide an explanation of objective medical evidence.[9]  For M.A.L.'s standing/walking capacity, Dr. Natarajan stated only, "The claimant complains of numbness."  AR 981.  Similarly, for M.A.L.'s assessed sitting capacity, which the ALJ correctly noted Dr. Natarajan stated as being both "[t]wo to three hours" and "up to two hours in an eight-hour workday," Dr. Natarajan explained only that M.A.L. "again complains of numbness and low back pain."  AR 981; *see also* AR 50.  For the assessed postural and manipulative limitations, Dr. Natarajan simply stated that M.A.L. had those limitations, without further explanation.  AR 981-982.

The ALJ also discounted Dr. Natarajan's functional assessments as unsupported by Dr. Natarajan's own findings.  M.A.L. disputes the ALJ's explanation that "forward reaching" limitations are not supported by her "shoulder range of motion findings" (AR 50), arguing that "the assessment of upper extremity limitations were clearly assessed based on radicular symptoms arising from [M.A.L.]'s neck and shoulder dysfunction" (Dkt. No. 10 at 13).  While Dr. Natarajan diagnosed "[b]ilateral shoulder pain with limited range-of-motion on both the shoulders," her report said nothing about radicular symptoms associated with shoulder dysfunction and expressly stated that there was no objective evidence of radiculopathy with respect to M.A.L.'s neck pain.

---

[9] "Objective medical evidence is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption."  20 C.F.R. § 404.1529(c)(2).

1    AR 981.  M.A.L. does not take issue with the ALJ's explanation that "[t]he handling, fingering,

2    and feeling limitation is not supported by any particular sensory, strength, or other manipulative

3    findings" or that the assessed standing/walking limitations "are not supported by the examination,

4    which did not yield gait, strength, sensory, or reflex findings."  AR 50.  Indeed, Dr. Natarajan's

5    report notes that "[s]trength is 5/5 in the bilateral upper and lower extremities, including grip.

6    Normal bulk and tone; no atrophy noted."  AR 981.  Dr. Natarajan's sensory exam revealed

7    sensation "[g]rossly intact to light touch and pinprick through the bilateral upper and lower

8    extremities."  *Id.*  Dr. Natarajan noted that reflexes of the [b]ilateral upper and lower extremities

9    are 2+."  *Id.*  The ALJ also found that Dr. Natarajan's "assessed 'problems with balance'" are not

10   supported by any particular findings.  As noted by the Commissioner, the Romberg test for

11   balance was negative, and Dr. Natarajan found no need for any assistive devices.  AR 979.

12       With respect to consistency, the ALJ explained that Dr. Natarajan's assessed limitations,

13   including "the sitting limitations, the lifting/carrying limitations, and most of the postural findings

14   are not consistent with the minimally abnormal physical examination findings throughout the

15   record, primarily limited to range of motion, the large gaps in treatment, and the improvement

16   when the claimant did receive epidurals, etc."  AR 50 (citing AR 567 and "etc.").  Although it is

17   unclear how the ALJ's reference to "etc." should be interpreted, in discussing clinical findings in

18   the record as compared with Dr. Natarajan's statement, the ALJ correctly noted that Dr.

19   Natarajan's finding regarding a positive straight-leg raise test "appears to stand alone, so is not

20   durational."  AR 49; *compare* AR 480-481 *with* AR 980.  M.A.L. does not appear to seriously

21   dispute the ALJ's statement regarding inconsistency with "minimally abnormal examination

22   findings" in the record.  Instead, she maintains that Dr. Natarajan's opinion is consistent with

23   additional evidence that M.A.L. submitted after the ALJ issued her decision.  *See* Dkt. No. 10 at

24   14.[10]

25       The ALJ's decision finding Dr. Natarajan's opinion "not persuasive" is supported by

26   substantial evidence.  Accordingly, the Court finds no error.  On this issue M.A.L.'s summary

27

28   [10] The parties' arguments regarding additional evidence M.A.L. submitted to the Appeals Council
     are addressed below.

United States District Court
Northern District of California

1    judgment motion is denied and the Commissioner's motion is granted.

2        **C.      New Evidence to Appeals Council**

3        M.A.L. argues that remand is warranted for the ALJ to review additional evidence M.A.L.

4    submitted to the Appeals Council after the ALJ issued her decision.  The Commissioner maintains

5    that the additional evidence does not undermine the ALJ's decision.

6                    **1.      Legal Standard**

7        Regulations provide that the Appeals Council "will review a case if . . . [it] receives

8    additional evidence that is new, material, and relates to the period on or before the date of the

9    hearing decision, [ ] there is a reasonable probability that the additional evidence would change the

10   outcome of the decision," and there is "good cause" for not submitting the new evidence earlier.

11   20 C.F.R. § 404.970(a)(5), (b).  "Where the Appeals Council was required to consider additional

12   evidence, but failed to do so, remand to the ALJ is appropriate so that the ALJ can reconsider its

13   decision in light of the additional evidence."  *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d

14   1228, 1233 (9th Cir. 2011).  "[W]hen a claimant submits evidence for the first time to the Appeals

15   Council, which considers that evidence in denying review of the ALJ's decision, the new evidence

16   is part of the administrative record, which the district court must consider in determining whether

17   the Commissioner's decision is supported by substantial evidence."  *Brewes v. Comm'r of Soc.*

18   *Sec. Admin.*, 682 F.3d 1157, 1159-60; *see also id*. at 1162-63.

19                   **2.      Analysis**

20       With respect to the additional evidence M.A.L. submitted to the Appeals Council, the

21   parties appear to agree that the Court should consider this evidence consistent with *Brewes*, but

22   they disagree about whether this additional evidence undermines support for the ALJ's

23   determination that M.A.L. is not disabled.  *See* Dkt. No. 10 at 14-15; Dkt. No. 14 at 9-10.

24       Remand is not warranted based on M.A.L.'s additional evidence consisting of a June 2022

25   pathology report regarding her colonoscopy results.  *See* AR 61.  The Appeals Council found that

26   the report "did not show a reasonable probability that it would change the outcome of the [ALJ's]

27   decision."  AR 2.  Indeed, nothing in that report is material to the ALJ's evaluation of evidence

28   concerning M.A.L.'s neck and back issues and associated symptoms.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    The remainder of M.A.L.'s additional evidence consists of an August 2022 chiropractic

2    treatment record from Cater Chiropractic Inc. (AR 32-33) and records dated in September,

3    November, and December 2022 from Jesse Bernstein, M.D. at the Monterey Spine and Joint clinic

4    (AR 9-23).  The August 10, 2022 Cater Chiropractic record documents an initial visit in which

5    M.A.L. presented with complaints of neck and low back pain since her June 2019 car accident.

6    AR 32.  The Appeals Council found that this evidence "does not show a reasonable probability

7    that it would change the outcome of the[ALJ's] decision."  AR 2.

8    The September, November, and December 2022 Spine and Joint clinic records reflect

9    treatment for neck and low back pain due to M.A.L.'s June 2019 accident.  AR 9-23.  The Appeals

10   Council concluded that this evidence "does not relate to the period at issue," and "[t]herefore, it

11   does not affect the decision about whether [M.A.L. was] disabled beginning one or before July 20,

12   2022," the date of the ALJ's decision.  AR 2.

13   The Court agrees that these records do not undermine the ALJ's findings, except to the

14   extent that the Spine and Joint treatment records document degenerative changes reflected in

15   September 20, 2022 MRIs of M.A.L.'s cervical and lumbar spine.  As noted in those records, a

16   September 20, 2022 MRI of M.A.L.'s lumbar spine showed "[d]egenerative changes throughout

17   the visualized thoracolumbar spine with neural foraminal lateral recess encroachment resulting

18   nerve abutment and/or impingement," and a September 20, 2022 cervical MRI revealed

19   spondylosis at C3-C7 "resulting in varying degrees of neural foraminal encroachment greatest on

20   the left at C5-C6," as well as moderate stenosis.  AR 20, 22.  Although these MRIs post-date the

21   ALJ's decision, they concern the same conditions that the ALJ identified as severe impairments

22   and suggest a significant increase in the severity of these same conditions shortly after the ALJ's

23   decision.  "'[E]vidence dated *after* an ALJ's decision can still be related to the period before the

24   ALJ's decision."  *Jesus M. G. R. v. Kijakazi*, No. 10-cv-07426-DMR, 2021 WL 4243387, at *4

25   (N.D. Cal. Sept. 17, 2021) (quoting *Baker v. Colvin*, No. 16-CV-00771-EMC, 2016 WL 5869944,

26   at *4 (N.D. Cal. Oct. 7, 2016)).  "This includes records addressing treatment for 'the same kinds of

27   impairments for which [a claimant] was treated before the ALJ's decision' and treatment for

28   ongoing impairments."  *Id*. (quoting *Baker*, 2016 WL 586994 at *5).  The updated MRIs of

1   M.A.L.'s cervical and lumbar spine, which were conducted within two months of the ALJ's

2   decision, undermine the ALJ's reliance on objective evidence showing what she described as

3   largely normal or mildly abnormal findings.  The MRIs are not inconsistent with M.A.L.'s

4   symptom allegations, and therefore are directly relevant to the ALJ's evaluation of M.A.L.'s

5   allegations.

6          Considering the record as whole, including the new MRI evidence M.A.L. submitted to the

7   Appeals Council, the Court concludes that the Commissioner's decision is not supported by

8   substantial evidence and that remand is warranted.  On this issue, M.A.L.'s summary judgment

9   motion is granted, and the Commissioner's summary judgment motion is denied.

10  **IV.    CONCLUSION**

11         Based on the foregoing, the Court grants in part and denies in part M.A.L.'s motion for

12  summary judgment, grants in part and denies in part the Commissioner's cross-motion for

13  summary judgment, and remands this matter for further administrative proceedings consistent with

14  this order.

15         **IT IS SO ORDERED.**

16  Dated: October 1, 2024

17

18

19                                            Virginia K. DeMarchi
                                              United States Magistrate Judge

20

21

22

23

24

25

26

27

28